

# In the
# Missouri Court of Appeals
## Western District

MARSHA ZERPA, A SURVIVING
SPOUSE OF NICHOLAS ZERPA,
DECEASED,

       **Appellant,**

v.

XPO LOGISTICS FREIGHT, INC., AND
TIMOTHY LEE CHAMBERS,

       **Respondents.**

**WD84947**

**OPINION FILED:**

**DECEMBER 6, 2022**

**Appeal from the Circuit Court of Bates County, Missouri
The Honorable Michael B. Baker, Judge**

**Before Division Three: Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge,
Anthony Rex Gabbert, Judge**

Marsha Zerpa ("Plaintiff") appeals from a judgment entered upon a jury verdict finding in

favor of XPO Logistics Freight, Inc. ("XPO Freight") and Timothy Lee Chambers ("Chambers")

("Defendants" collectively) on Plaintiff's "Petition for Wrongful Death" alleging that the death of

her husband, Nicholas Zerpa ("Zerpa"), was negligently caused by XPO Freight and Chambers

when Zerpa's vehicle crossed the center median into Chambers's lane of traffic, colliding with the

XPO Freight tractor-trailer Chambers was driving. Plaintiff contends on appeal that the circuit court erred in giving Defendants' Instruction No. 10 to the jury over Plaintiff's objection, arguing that it was an improper affirmative converse instruction and prejudiced Plaintiff in that, 1) Plaintiff's verdict director did not improperly assume as true or omit any ultimate disputed issue, 2) the facts hypothesized in the instruction were insufficient to bar Plaintiff's recovery, and 3) the instruction reframes the accident as a sole cause issue which conflicts with MAI 1.03. We reverse and remand.

**Factual Background and Procedural History**

On September 28, 2018, Zerpa was a passenger in an Isuzu box truck owned by Zerpa and driven by Ricky Robertson. Zerpa owned a moving company and Robertson was working with Zerpa that day to move residential customers in the Kansas City area. While in route from Joplin to Kansas City heading northbound, the left front tire of Zerpa's truck blew out from an unknown cause. Immediately thereafter, Zerpa's vehicle traveled into the northbound passing lane, across the grassy median, and into the southbound lane where it collided with an XPO Freight tractor-trailer driven by Chambers. Zerpa was killed, and Robertson was permanently disabled.

On May 28, 2019, Plaintiff filed her "Petition for Wrongful Death" alleging that Zerpa's death was negligently, in whole or in part, caused by XPO Freight and Chambers.[1] The case was tried before a jury on August 24-30, 2021. Plaintiff contended at trial that, following accepted methodology for professional truck drivers, the accident was avoidable if Chambers had used the

[1] Plaintiff's petition also named Robertson as a defendant, alleging that he was negligent in controlling the Isuzu box truck. Robertson's Next Friend filed a petition on Robertson's behalf against Zerpa's estate, alleging that Robertson suffered significant injuries, including brain injury and leg amputations, caused by Zerpa's negligence in maintaining his vehicle. Plaintiff and Robertson appear to have settled their claims prior to trial, and Robertson is not part of this appeal.

2

highest degree of care and Chambers was negligent for failing to do so. Defendants contended that the vehicle's driver, Robertson, had any number of actions he could have taken under the circumstances, and Chambers was not negligent in his own actions, in part because he could not predict what Robertson's actions were going to be.

Plaintiff's first witness was Defendant Chambers. Chambers testified in general that, if it is safe to apply brakes to avoid hitting something, he would want to do that. He agreed that different braking procedures are utilized in expected versus emergency situations, and that it is generally preferable to avoid emergency braking. Chambers is trained in defensive driving and received specialized training to help contemplate various situations that might occur and how best to react in those situations. Chambers has been trained to expect other drivers to make mistakes and to think about what he would do if such a mistake were to occur. Plaintiff's attorneys questioned Chambers on the fact that he was trained to anticipate hazards ahead of time "because you don't know what other vehicles are always going to do, do you?" Chambers agreed. Chambers additionally agreed that it is sometimes possible to avoid collisions, even if the other driver created the situation, if there is an awareness in time to act.

Chambers agreed with Plaintiff's counsel that a driver cannot assume that another driver will react to a situation in the same manner Chambers would, and cannot assume anything about what the other driver will do. Chambers testified that all he can do in a defensive driving emergency situation is to process information regarding the situation unfolding in front of him and make a good decision as how to avoid a collision. Simultaneously, however, he must also consider what actions he should take that are safe for other people on the road and not just the driver creating the hazard. While Plaintiff's counsel asked Chambers to agree that Chambers had to assume that, if Robertson was on a direct path toward Chambers's truck, Robertson would stay on that direct

3

path, Chambers consistently testified that he had no idea what direction Robertson was going to travel or turn. Chambers likewise would not agree that slowing a vehicle is always the safest option in an emergency situation.

Chambers testified that when he saw the Isuzu box truck headed toward him, he straightened his steering wheel "out in the curve to give them a little more room," all the while trying to process what was going to happen because he did not know which way the box truck was going to go. He testified that he did not know if the truck was going to turn, accelerate, or stop. Chambers stated that, "with other traffic around me, I chose to hold my course, stay in my lane as much as possible, and keep my vehicle under control." Further, "I chose to stay on the course I was on and give them room by moving over." Chambers testified, and his dash camera showed, that a white pickup truck passed Chambers on his left during the same time frame the box truck was heading toward Chambers's lane. The box truck barely missed hitting the white pickup truck. Chambers believed that, even if Chambers had applied his brakes, the box truck would have still hit him. Chambers agreed that immediately after the accident he told Highway Patrol Trooper Siercks that, "I looked up and I saw that truck coming down through the grass. There was nothing I could do."

On cross-examination, Chambers testified that he had driven a commercial motor vehicle for forty-one years and had taken the route he was driving the day of the accident hundreds of times. Chambers saw the box truck when it entered the grassy median and recognized that it had a problem and must be out of control. Chambers paid attention to the box truck, but also to the pickup truck that was passing him, the curvature of the road, and another "semi" that was ahead of Chambers. He stated that, "Well, I was watching the curvature of the highway, I was watching the box truck, the pickup truck, the semi in front, and I didn't know which way anybody was going

4

to commit to. So I decided to hold my course and try to keep my own equipment on the road." Chambers stated that, as the situation unfolded he was processing all of it but had no idea what the path of the box truck was going to be. If he had known what path the box truck was going to take in advance, he would have taken steps to avoid the collision. Chambers testified on redirect that, "If I would have hit my brakes, we still could have hit. I decided to keep my course and keep my equipment under control."

Plaintiff's second witness was accident reconstruction specialist Robert S. McKinzie. McKinzie testified on direct examination that everyone has a duty to avoid a collision if possible, but cannot predict what other people are going to do, "so at some point in that process, when it's obvious to us that the vehicle is not in compliance [with driving laws], then the only thing we can 100 percent rely on is what we choose to do." McKinzie testified that there was no evidence to explain why Robertson did not do something to control the box truck and take a different path. McKinzie testified that there was no evidence that the steering in the box truck failed, or that once the tire failed, that Robertson attempted to turn the vehicle back into his northbound lane. McKinzie stated that, "even with a blowout, the vehicle is controllable" and that, even if Robertson was unable to steer the vehicle due to lack of training, there was "no reason why the vehicle couldn't have been braked." McKinzie opined that, nevertheless, "we all have to play a contributing part in avoidance of collisions" and if another vehicle goes out of control, "we have a duty to try to avoid a collision with that object, if that's possible." McKinzie believed that, in the context of this particular accident, Chambers should have attempted to avoid the accident, and Chambers could have avoided the accident. Based on the dash camera in Chambers's truck, eight seconds elapsed from the moment of the box truck tire blowout until the collision. McKinzie opined that Chambers first saw the box truck approximately 4.75 seconds prior to the collision and

when the box truck was approximately 461 feet away. McKinzie stated that, if Chambers had applied his brakes and achieved a ".4 drag factor deceleration, the collision could have been avoided" if Robertson's speed did not change from an estimated fifty miles per hour. McKinzie further opined that, had Chambers applied his brakes as soon as the hazard was recognized, the collision could have been avoided. Further, Chambers should have applied his brakes to give himself more time to assess the situation.

On cross-examination, McKinzie testified that Robertson may have actually continued to accelerate the box truck for a distance after the blowout. Further, Robertson could have kept the box truck on the pavement and in the northbound lanes if he was taking actions that a safe and careful commercially licensed driver could take. Additionally, even if the box truck went into the grassy median, Robertson should have been able to maintain directional control and keep the vehicle in the grassy median. McKinzie testified that, if Robertson had taken correct steering action, the accident would have never happened. Further, that Robertson should have "absolutely" applied his brakes, and had he applied moderate braking after the blowout, he could have stopped his truck prior to the collision. Additionally, there was no way for Chambers to know what the box truck was going to do, i.e., what path it would ultimately take or whether it would increase speed or brake.

Defendants' accident reconstructionist, Fred Semke, testified that, based on various data suggesting when Chambers first observed the hazard, and then applying the reaction time estimated by Defendants' engineering expert, there was no way Chambers could have avoided the accident. Semke presented a video simulation demonstrating possible outcomes based on the various actions each vehicle's driver could have taken in the seconds leading up to the impact. The possible scenarios included that, 1) Robertson could have steered the vehicle after the blowout

6

and stayed in the northbound lanes, avoiding the accident entirely, 2) Robertson could have applied his brakes after the blowout and stopped in the median prior to entering the southbound lanes, avoiding the accident entirely, 3) Robertson and Chambers both could have utilized some combination of braking and/or steering, in which case, there would have been many more unknowns, some of which would have resulted in an accident and some of which would not have.

At the close of the evidence, the jury returned a verdict in favor of Defendants.

## Standard of Review

"[W]hether the jury was properly instructed is a question of law that is reviewed *de novo*." *Chavez v. Cedar Fair, LP*, 450 S.W.3d 291, 294 (Mo. banc 2014). We review the record in the light most favorable to submission of the instruction. *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010). "Any issue submitted to the jury in an instruction must be supported by substantial evidence from which the jury could reasonably find such issue." *Id.* We will only vacate a judgment on the basis of instructional error if the error materially affected the merits of the action. *Chavez*, 450 S.W.3d at 294. The party challenging the instruction has the burden of showing the instruction misdirected, misled, or confused the jury, thereby resulting in prejudice. *Id.*

## Points on Appeal

Plaintiff contends on appeal that the circuit court erred in giving Defendants' Instruction No. 10 over Plaintiff's objection, arguing that it was an improper affirmative converse instruction and prejudiced Plaintiff in that, 1) Plaintiff's verdict director did not improperly assume as true or omit any ultimate disputed issue, 2) the facts hypothesized in the instruction were insufficient to bar Plaintiff's recovery, and 3) the instruction reframes the accident as a sole cause issue which conflicts with MAI 1.03. Because Plaintiff's second point on appeal requires reversal, we need not address points I and III.

Affirmative converse instructions are described in MAI 33.01 and 33.05.[2] *Hiers v. Lemley*, 834 S.W.2d 729, 730 (Mo. banc 1992). "[A]n affirmative converse [instruction] presents a hypothetical ultimate issue which, if true, would defeat plaintiff's claim" and "requires independent evidence for support." *Id.* at 734. "The affirmative converse instruction is not to be used merely as a means of conversing, in different language, the very same issue submitted in the verdict director instruction." *Id.* at 735. "An affirmative converse instruction is appropriate where the verdict director assumes as true or omits a disputed ultimate issue." *Id.* "An affirmative converse instruction may be appropriate where it is used by a defendant to submit an ultimate issue that was erroneously excluded from plaintiff's verdict director." *Id.* at 736. Affirmative converse instructions are "suspect unless the converse submits a contested ultimate issue that was omitted from or assumed as true in the verdict director." *Id*.

### Point II – Verdict Director Hypothesizes Facts Insufficient to Bar Recovery

In Plaintiff's second point on appeal, Plaintiff contends that the circuit court erred in submitting Instruction No. 10 to the jury over Plaintiff's objection, arguing that it was an improper and prejudicial affirmative converse instruction because the converse instruction hypothesized facts that were not sufficient to bar recovery. We agree.

Plaintiff's verdict director, Instruction No. 9, was modeled from MAI 17.02 and 17.04, and provided as follows (with the definitions of "negligence," MAI 11.02(II), and "highest degree of care," MAI 11.01, inserted herein in parentheses for ease of readership, though the definitions were provided separately in the instructions given to the jury):

INSTRUCTION 9

Your verdict must be for Plaintiff if you believe:

---

[2] All references to the Missouri Approved Instructions are to MAI 8th Edition, 2020.

First, either:

>  defendant Chambers failed to keep a careful lookout; or

>  defendant Chambers knew or by the use of the highest degree of care (i.e. "that degree of care that a very careful person would use under the same or similar circumstances") could have known that there was a reasonable likelihood of collision in time thereafter to have slackened speed but defendant failed to do so; and

Second, defendant Chambers, in any one or more of the respects submitted in paragraph First was thereby negligent (i.e., failed to use the degree of care that a very careful person would use under the same or similar circumstances), and

Third, such negligence directly caused or directly contributed to cause the death of Nicholas Zerpa.

Unless you believe plaintiff is not entitled to recover by reason of Instruction Number 10.

Plaintiff's verdict director thus submitted two disjunctive acts or omissions as potential bases for the jury to find that defendant Chambers was negligent.[3]

Defendants' Affirmative Converse Instruction No. 10, following MAI 33.05(1), was as follows:

INSTRUCTION 10

>  Your verdict must be for the defendants if you believe defendant Chambers could not by use of the highest degree of care have anticipated the travel path of the oncoming box truck with sufficient accuracy to avoid the collision.

To be a proper affirmative converse, Defendants must be able to establish that the inability to anticipate the travel path of the oncoming box truck with sufficient accuracy to avoid a collision

---

[3] We express no opinion as to whether the language in paragraph First of the verdict director submitting defendant Chambers's failure to slacken his speed was proper, an issue that has not been raised on appeal.

9

is a fact that, if true, defeats Plaintiff's ability to establish that either the failure to keep a careful lookout or the failure to slacken speed constituted negligence that caused or contributed to cause Nicholas Zerpa's death. We are aware of no authority, nor have the Defendants directed us to any authority, that elevates an inability to predict the travel path of an oncoming vehicle to the level of an absolute defense to a claim of negligence. Though that fact may well be relevant to a jury's assessment of whether the failure to keep a careful lookout or to slacken speed was negligent, the concepts are not mutually exclusive.

The ultimate disputed issue in this case was whether Chambers was negligent under the circumstances. Those circumstances included Chambers's ability and/or inability to anticipate the travel path of the box truck with sufficient accuracy to avoid the collision. Instruction No. 9, as offered by Plaintiff, did not omit the ultimate issue of whether Chambers was negligent under the circumstances.

Instruction No. 9, as offered by Plaintiff, allowed the jury to find for Defendants if the jury determined that a very careful person *under Chambers's circumstances* could not have known the likelihood of a collision in time to slacken speed. Chambers testified that he had no idea which way the box truck was ultimately going to travel. Hence, an evidentiary factor the jury could have considered under Paragraph First to have impacted Chambers's ability to know the likelihood of a collision was his reported inability to sufficiently anticipate the travel path of the box truck. Further, Paragraph Second allowed the jury to find for Defendants if the jury concluded that, even if Chambers knew or could have known there was a reasonable likelihood of collision in time to slacken speed and failed to do so, Chambers did not fail to act as a very careful person under the circumstances by not slackening speed. Chambers testified that he had to consider the safety of all motorists around him and not just the box truck when determining what action to take, and

10

Chambers determined that the safest option was to stay the course and try to give the box truck more room in the curve. Chambers could not predict whether the box truck would speed up, brake, or turn another direction, and this was a circumstance that affected Chambers's actions. All of these circumstances were evidentiary factors the jury could have considered in making a negligence determination under Plaintiff's proposed verdict director. Defendants' Instruction No. 10 did not converse the ultimate issue of Chambers's negligence under the circumstances, but instead improperly directed the jury that it could not find Chambers to be negligent, as a matter of law, if he could not have anticipated the path of the box truck.

Because Instruction No. 10 required the jury to find in favor of Defendants if it found a fact to be true that did not, as a matter of law, bar Plaintiff's right to recovery, Plaintiff was prejudiced by submission of Instruction No. 10 to the jury.

The circuit court erred in giving Defendants' Instruction No. 10 to the jury over Plaintiff's objection. Instruction No. 10 was an improper affirmative converse instruction because it hypothesized facts that were not sufficient to bar Plaintiff's recovery.

Plaintiff's second point on appeal is granted.

### Conclusion

The circuit court's judgment is reversed, and the cause is remanded for a new trial.

_____
Anthony Rex Gabbert, Judge

All concur.

11